RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CHERRYL KIRILENKO-ISON; SUSAN BAUDER-SMITH,

                    *Plaintiffs-Appellants*,

     *v.*

BOARD OF EDUCATION OF DANVILLE INDEPENDENT SCHOOLS,

                    *Defendant-Appellee*.

No. 19-5767

─────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:18-cv-00435—Danny C. Reeves, Chief District Judge.

Argued: June 9, 2020

Decided and Filed: September 4, 2020

Before: CLAY, ROGERS, and DONALD, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Edward E. Dove, Lexington, Kentucky, for Appellants. Elizabeth A. Deener, LANDRUM & SHOUSE LLP, Lexington, Kentucky, for Appellee. **ON BRIEF:** Edward E. Dove, Lexington, Kentucky, for Appellants. Elizabeth A. Deener, LANDRUM & SHOUSE LLP, Lexington, Kentucky, for Appellee.

─────────────────

## OPINION

─────────────────

CLAY, Circuit Judge. Plaintiffs Cherryl Kirilenko-Ison and Susan Bauder-Smith appeal the district court's order granting summary judgment in favor of their former employer,

Defendant Board of Education of Danville Independent Schools ("School Board"). Plaintiffs assert that the School Board illegally retaliated against them for their advocacy on behalf of two disabled students, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 701 *et seq.*, and the Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. § 344. Plaintiffs also claim that the School Board violated the Kentucky Whistleblower Act, Ky. Rev. Stat. § 61.102, by retaliating against them for reporting a parent's suspected child neglect to Kentucky's Cabinet for Families and Children. Plaintiff Kirilenko-Ison further asserts that the School Board failed to accommodate her disability and constructively discharged her, in violation of the ADA and the KCRA. For the reasons that follow, we affirm in part and reverse in part the district court's grant of summary judgment.

## BACKGROUND

### A. Factual Background

Plaintiffs in this case are two nurses who were employed by the Board of Education of Danville Independent Schools at all relevant times. Plaintiff Kirilenko-Ison was a registered nurse, Medicaid billing coordinator, and the health services coordinator for the School Board. Plaintiff Bauder-Smith was a part-time school nurse employed by the School Board. In 2014, the School Board hired Bauder-Smith and another part-time nurse, Nancy Nye, to fill the nursing positions funded by a three-year grant for physical and health education. The crux of Plaintiffs' complaint is that the School Board retaliated against them for advocating for the rights of two students who are disabled within the meaning of the ADA, Section 504, and the KCRA.

### 1. Plaintiffs' Advocacy on Behalf of D.M.

In the 2015–2016 school year, Plaintiffs allegedly advocated for the rights of D.M., a middle school student with type-1 diabetes. According to Plaintiffs, they assisted the school in developing an accommodation plan for D.M. pursuant to Section 504 of the Rehabilitation Act ("§ 504 plan"). However, they say that they were unable to adequately care for D.M.'s health because the child's parent neglected her diabetic needs. D.M.'s mother was allegedly noncompliant with the child's health plan at home and would not provide supplies that were

necessary for D.M.'s care at school. Because of the mother's noncompliance with the child's medical plan, Kirilenko-Ison and Bauder-Smith discussed filing a complaint with the Cabinet for Families and Children. Plaintiffs say that they told the School Board about their concerns regarding D.M.'s care but that they received little or no support. The superintendent of the school system, Keith Look, told them not to file a complaint with the Cabinet.

In May 2016, D.M.'s mother requested that Plaintiffs no longer be allowed to provide care for D.M. Plaintiffs then filed a complaint with the Cabinet, in which they reported D.M.'s mother for suspected neglect. In response, D.M.'s mother submitted a complaint to the School Board regarding Plaintiffs. This triggered an informal inquiry into the situation regarding D.M.'s care, in which Superintendent Look asked Plaintiffs to write a report about what happened.

Following the situation with D.M., the School Board did not take any immediate retaliatory actions against Plaintiffs. At the end of the 2015–2016 school year, Kirilenko-Ison's annual contract was renewed for the upcoming 2016–2017 school year and Bauder-Smith's three-year contract remained intact.

### 2. Plaintiffs' Advocacy on Behalf of C.J.

During the 2016–2017 school year, Plaintiffs assisted with the medical care of C.J., an elementary school student who had recently been diagnosed with diabetes. In September 2016, Plaintiffs attended a meeting with C.J.'s mother to develop a § 504 plan for C.J. ("first § 504 meeting"). Robin Kelly (the principal of the school), Lindsay Carpenter (the student's teacher), and Nye also attended the meeting. The attendees formulated a § 504 plan in accordance with C.J.'s Diabetic Management Plan ("DMMP"), which had been developed by his doctors.

Following this first § 504 meeting, Plaintiffs and C.J.'s mother began to have various disagreements about how to implement the plan. There were two primary points of disagreement between Plaintiffs and C.J.'s mother: one relating to the child's ability to eat breakfast at school and another relating to his ability to ride the school bus.

In her deposition, Kirilenko-Ison explained that C.J.'s meals should be at least four hours apart or else there is a risk of "insulin stacking, which causes harm to the child and causes low—

extremely low blood sugar, which was occurring in the afternoons." (Kirilenko-Ison Dep., R. 30-2, Pg. ID 149.) C.J. would usually arrive late to school without having eaten breakfast, and there was not enough time to permit him to eat breakfast at school and then have a four-hour block of time without insulin before lunch. Plaintiffs therefore encouraged C.J.'s mother to have him eat breakfast at home before arriving to school. However, C.J.'s mother insisted that C.J. be allowed to "eat a regular breakfast at school." (*Id.*)

Defendant says that permitting C.J. to eat breakfast at school was in full compliance with C.J.'s § 504 plan and DMMP. But Plaintiffs say that allowing C.J. to eat breakfast at school would have been detrimental to his health due to the risk of insulin stacking and would have placed their nursing licenses in jeopardy.

Plaintiffs and C.J.'s mother also disagreed about C.J.'s participation in various school activities, including riding the school bus. It appears that Plaintiffs did not want C.J. to ride the bus if his glucose levels were low because he could go into a hypoglycemic episode. However, according to Plaintiffs, C.J.'s mother insisted that he be permitted to ride the bus "no matter what his blood glucose levels were," and that he be able to go to his other school activities "while in a hypoglycemic state." (*Id.*)

On October 14, 2016, a second meeting was held to revise C.J.'s § 504 plan ("second § 504 meeting"). Plaintiffs, Nye, Kelly, Carpenter, and C.J.'s mother again attended the meeting. During the meeting, Bauder-Smith presented a hypothetical to C.J.'s mother, in which she asked "if [C.J.'s] blood sugar is low and he goes back to class and falls down and is unconscious, then who is going to be responsible because he was allowed to go back to class." (*Id.* at Pg. ID 159.) C.J.'s mother then abruptly left the meeting, and no new § 504 plan was developed.

At that point, Kelly reprimanded Plaintiffs. According to Kirilenko-Ison, Kelly "was screaming at [her] about doing what the parent wants and she didn't care about [her] nursing license, which really she was talking to all the nurses, and that we're going to do what the parent wants." (*Id.*) According to Bauder-Smith, "Robin Kelly sided with the mother and said directly to [Kirilenko-Ison], but meaning all three of [the nurses], that we're going to do what the parent

wants, that she's in the district, [the parent is] not going anywhere." (Bauder-Smith Dep., R. 30-3, Pg. ID 202.)

After the second § 504 meeting, C.J.'s mother wrote a detailed complaint against Kirilenko-Ison, and Kirilenko-Ison was taken off the case. The school staff then held a third § 504 meeting with C.J.'s mother, but neither Plaintiff was invited to attend the meeting ("third § 504 meeting"). The third meeting resulted in a new § 504 plan for C.J., which Plaintiffs reviewed and, subsequent to revisions, effectively approved.

At some point in November 2016, Nancy Nye resigned from her part-time nursing position with the school. Her resignation letter lists several reasons why she felt compelled to resign:

> I feel it is my obligation to inform the School Board of the environment which has surfaced that has made it necessary for this resignation.
>
> - There is a standard of care each and every nurse is required to meet. The district has asked the nurses to work contrary to this.
>
> - Nurses are required, by law to work under orders from doctors. They are limited as to what they can do within these orders. . . . The district has asked nurses to overstep these limits.
>
>   . . . .
>
> - The district has hired some of the nurses for particular hours. The nurses have been as accommodating as possible. However, when members of the administration give verbal threats to pressure nurses into changing their hours, I will not standby [sic].
>
> - I will not be a part of one person's vendetta against another by using her son as a reason.
>
> - The environment of distrust created by this issue has become more than I am willing to put up with.

(Nye Letter, R. 34-7, Pg. ID 427.)

In an email to Ed McKinney in December 2016, Bauder-Smith said that she would no longer provide care to C.J.:

> I am no longer asking to be removed from this case. According to the last time we met about my hours, I now fall into the spectrum you stated. "I can loose [sic] my job, or Dr Look can have empathy for me, or he can do something in between

that spectrum." "If the district who writes my checks" disapproves I am ready to face the consequences.

. . . .

So, this is no longer a request. I will service lunch today and I'm done unless the doctor's orders are followed to the letter, meaning breakfast at home for proper timing of insulin. Splitting correction and carbs in morning takes things out of my control. Last week [C.J.'s mother] didn't cover carbs at home, this week she [is] not checking blood sugars!

(Bauder-Smith Email, R. 34-6, Pg. ID 426.)

Also in December 2016, Ed McKinney and David Davis were assigned to investigate C.J.'s mother's complaint regarding Kirilenko-Ison. Kirilenko-Ison, represented by counsel, met with Superintendent Look to discuss the investigation. On February 7, 2017, Superintendent Look summarized the investigation's findings in a seven-page memorandum that he provided to Kirilenko-Ison. Look in his memorandum concluded that Kirilenko-Ison's conduct placed C.J.'s rights to a free appropriate public education ("FAPE") into jeopardy "and certainly undermined the spirit of FAPE" by treating C.J. differently from other students with regard to his meals, activities, and transportation. (*See* Suspension Letter, R. 30-14, Pg. ID 255.) Look also found that Kirilenko-Ison's conduct violated the 2015 New Code of Ethics for Nurses and an Advisory Opinion Statement from the Kentucky Board of Nursing ("KBN") on the role of nurses in implementing patient care orders. Kirilenko-Ison was then suspended for five days without pay from February 9, 2017 through February 15, 2017.

### 3. Kirilenko-Ison's Accommodations Request

Following her five-day suspension in February, Kirilenko-Ison took leave under the Family and Medical Leave Act ("FMLA") for the remainder of the school year. Kirilenko-Ison has "autonomic nervous system dysfunction[,] . . . lupus, Parkinsonism, POTS, and adjustment disorder with mixed emotion, and polyneuropathy." (Kirilenko-Ison Dep., R. 30-2, Pg. ID 166.) In May 2017, Kirilenko-Ison submitted an accommodations request to the School Board in preparation for her upcoming return to work. She requested accommodations including "[t]ime off work to treat condition," "[f]requent or longer breaks if necessary," "[d]ress code:

[c]ompression pants can be worn," and "[w]ork reassignment to decrease stress, work load," among others. (Accommodations Request, R. 30-15, Pg. ID 261.)

Kirilenko-Ison and the School Board provisionally entered into an employment contract for the 2017–2018 school year. In July 2017, a month and a half after Kirilenko-Ison had submitted her accommodations request and returned to work, she and Look met to discuss her accommodations request. The parties reviewed her requests, but the meeting broke down when Look asked for verification of Kirilenko-Ison's disabilities. According to Kirilenko-Ison, the interactive process broke down when Defendant demanded that she provide information about her disability diagnosis, to which Kirilenko-Ison objected. Defendant also allegedly placed a clause in Plaintiff's contract requiring that Plaintiff sign two medical release forms for Defendant to have her medical records by August 15, 2017, or her contract would be terminated. Kirilenko-Ison claims Dr. Look threatened to terminate her if she did not sign the release.

Kirilenko-Ison did not sign the release, and the School Board neither approved nor denied her accommodations request. Kirilenko-Ison applied for disability benefits and voluntarily resigned from her position in August 2017.

### 4. Bauder-Smith's Non-Renewal

Bauder-Smith's three-year contract ended on June 30, 2017. There was no guarantee of continued employment after the 2017 school year, but according to Plaintiffs' complaint, Bauder-Smith "had the belief that she would be rehired the next school year if funds were available." (Compl., R. 1-2, Pg. ID 12.) In August 2017, Defendant offered Bauder-Smith a substitute nursing position that would entail "only a few hours" of work. (*Id.*) Bauder-Smith turned it down because she was hoping for full-time employment. In November 2017, Defendant announced that it was seeking applicants for a full-time nurse. Bauder-Smith applied but was not hired.

### B. Procedural History

Plaintiffs Kirilenko-Ison and Bauder-Smith sued Defendant for illegal retaliation in violation of the ADA; Section 504; the KCRA; and the Kentucky Whistleblower Act, Ky. Rev.

Stat. § 61.102.  Kirilenko-Ison also sued Defendant for failing to accommodate her disabilities, in violation of the ADA and the KCRA.  Following discovery, Defendant moved for summary judgment on each of Plaintiffs' claims and the district court granted the motion in its entirety.  Plaintiffs now appeal the district court's grant of summary judgment in favor of Defendant.

## DISCUSSION

### A.  Standard of Review

"We review the district court's grant of summary judgment *de novo*."  *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute of a material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)).

When evaluating a motion for summary judgment, this Court views the evidence in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "This includes drawing 'all justifiable inferences' in the nonmoving party's favor."  *George*, 966 F.3d at 458 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Moreover, "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).

### B.  Plaintiffs' Retaliation Claims under the ADA, Section 504, and the KCRA

Plaintiffs assert that the School Board's decisions to suspend Kirilenko-Ison and to not rehire Bauder-Smith were in retaliation against Plaintiffs because of their advocacy on behalf of D.M. and C.J., in violation of the ADA, Section 504, and the KCRA.  This Court analyzes claims under the ADA and Section 504 together.  *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 696–97 (6th Cir. 2013).  We also interpret the KCRA in accordance with the federal laws.

*Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 531–32 (6th Cir. 2015); *see Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003) ("The Kentucky Civil Rights Act was modeled after federal law, and our courts have interpreted the Kentucky Act consistently therewith.").

Because Plaintiffs' retaliation claims are based on indirect evidence, we analyze them under the familiar *McDonnell Douglas* burden-shifting paradigm. *Shelby Cty.*, 711 F.3d at 697 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that paradigm, a plaintiff must first demonstrate a prima facie case of retaliation by showing that (1) she engaged in protected activity under the ADA and Section 504, (2) the defendant knew of the protected activity, (3) the defendant took an adverse action against the plaintiff, and (4) there was a causal connection between the adverse action and the plaintiff's protected activity. *Id.* "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). If the plaintiff demonstrates her prima facie case, the burden of production shifts to the defendant to show that it had "a legitimate, non-discriminatory basis" for the adverse action. *Id.* If it does so, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's reasons "'were not its true reasons, but were a pretext for' retaliation." *Id.* (quoting *DiCarlo v. Potter*, 358 F.3d 408, 414–15 (6th Cir. 2004)). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

The district court found that Plaintiffs engaged in protected activity under the ADA and Section 504 by advocating for the rights of disabled children. However, with regard to Bauder-Smith, the court held that she failed to demonstrate a causal connection between her protected activity and the School Board's failure to rehire her, or even interview her for an open position, after the completion of her contract. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, No. CV 5:18-435-DCR, 2019 WL 3068448, at *8 (E.D. Ky. July 12, 2019). Therefore, the district court granted summary judgment to Defendant on the ground that Bauder-Smith failed to establish her prima facie case of retaliation, and it did not reach the other steps of the *McDonnell Douglas* inquiry. *Id.* With regard to Kirilenko-Ison, the district court held that she had

established her prima facie case, but it determined that Kirilenko-Ison had failed to demonstrate a genuine factual dispute as to whether the School Board's reasons for suspending her were a pretext for retaliation. *Id.* at \*7.

For the reasons that follow, we find that the district court correctly held that Plaintiffs engaged in protected activity under the relevant statutes. However, we hold that Plaintiff Bauder-Smith did demonstrate a genuine factual dispute as to causation for purposes of satisfying her easy burden at the prima facie stage, and therefore reverse the district court's resolution of Bauder-Smith's claim on that ground. *See Nguyen*, 229 F.3d at 563 (emphasizing that a plaintiff's burden at the prima facie stage is "one easily met"). We do not reach the issue of pretext with respect to Bauder-Smith because the School Board did not move for summary judgment on that issue and the district court likewise did not reach it. With regard to Kirilenko-Ison, we hold that she demonstrated a genuine factual dispute at each stage of the *McDonnell Douglas* inquiry sufficient to overcome Defendant's motion for summary judgment. We therefore reverse the district court's judgment and remand to allow both Plaintiffs' retaliation claims to proceed.

### 1. Bauder-Smith

#### a. Protected Activity

The School Board challenges the district court's finding that Plaintiffs engaged in protected activity under the ADA, Section 504, and the KCRA. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a); *see also* 29 U.S.C. § 794(a), (d); 29 C.F.R. § 33.13. In accordance with this provision, this Court and others have held that advocating for members of a protected class is a protected activity for purposes of retaliation claims. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009) (Title VII); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (Section 504 and ADA). The district court, relying on *Reinhardt*, held that Plaintiffs had engaged in protected activity by "[a]dvocating for the rights of

disabled students." *Kirilenko-Ison*, 2019 WL 3068448, at \*6 (citing *Reinhardt*, 595 F.3d at 1132).

The School Board argues that Plaintiffs did not engage in protected activity because the Board was not discriminating against D.M. or C.J. It says that Plaintiffs "confuse disagreement with a parent over services requested *by the parent* and *approved by the child's doctor* with *discrimination against the child*. . . . Contrary to [Plaintiffs'] contentions, permitting a child to engage in an activity provided to all students, such as school breakfast, is *not discriminatory*. Preventing a child, or discouraging a child, from participating in such activities, solely because the child has Type I diabetes, *is discriminatory* and a denial of free appropriate education ['FAPE']." (Appellee Br. at 21 (emphasis in original).) In the School Board's view, Plaintiffs had not "opposed any act or practice made unlawful by" the ADA or Section 504 because the School Board was not engaged in any illegal activity under either statute. *See* 42 U.S.C. § 12203(a).

This argument is not supported by the case law. In *Reinhardt v. Albuquerque Public School Board of Education*, the primary case on which the district court relied, the Tenth Circuit held that a speech-language pathologist engaged in protected activity under the ADA and Section 504 when she complained that the school was not providing her with accurate and timely caseload lists of students who were entitled to special education services. 595 F.3d at 1130, 1132. She also filed a complaint with the state under the Individuals with Disabilities Education Act ("IDEA"), claiming that the inaccurate lists prevented qualified students from receiving speech and language services. *Id.* at 1130. At another point, the teacher advocated on behalf of a particular special education student, saying that he should have a neuropsychological evaluation and special reading instruction. *Id.* The Tenth Circuit held that "[a]ll three forms of Ms. Reinhardt's advocacy on behalf of disabled students constitute protected activity" under the ADA and Section 504 because the public school was required "to provide a 'free appropriate public education' by providing education and related services that 'are designed [to] meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons.'" *Id.* at 1132 (quoting 34 C.F.R. § 104.33(a), (b)(1) (2003)).

By challenging the school's failure to provide a FAPE to certain qualified students, the teacher in *Reinhardt* engaged in protected advocacy under the statutes.

The same is true here with regard to Plaintiffs' conduct, at least for purposes of demonstrating their prima facie cases. Kirilenko-Ison and Bauder-Smith were clearly disagreeing with the School Board about the accommodations that should be provided to D.M. and C.J. under their respective § 504 plans. With regard to D.M., Plaintiffs allege that they were not able to adequately render health services to the child because the child's parent was refusing to cooperate. They say that D.M.'s mother was noncompliant with D.M.'s § 504 plan. When Plaintiffs lodged their concerns about the student's health with Superintendent Look, he refused to assist them. When they told the Board that they were considering filing a complaint against the parent to the Cabinet of Families and Children in the interest of the child's health, Superintendent Look did not want them to file the complaint. After Plaintiffs filed the report, they received various threats from D.M.'s mother, including that Kirilenko-Ison "would pay" for filing the report, but Defendant did not assist them in responding to the student's mother. (*See* Pl.'s Resp. Def.'s Mot. Summ. J., R. 34, Pg. ID 401 (quoting Ex. 1, R. 34-1, Pg. ID 419).)

The situation with regard to C.J. was even more clearly about the provision of his § 504 plan. In that instance, Plaintiffs were again disagreeing with the student's parent over his medical needs. According to Plaintiffs, C.J. was consistently late to school and yet the parent insisted that he be permitted to eat breakfast at school. In Plaintiffs' view, however, this was dangerous to C.J.'s health because it risked insulin stacking whereby C.J.'s blood sugar would drop to extremely low levels in the afternoons. Plaintiffs allege that Kirilenko-Ison spoke with McKinney and told him that the mother's request would put the child at risk. Nevertheless, C.J.'s mother was informed that C.J. would be permitted to eat breakfast at school even on the days when there was a risk of insulin stacking.

Plaintiffs were also concerned about the mother's request that C.J. be permitted to participate in school activities when his blood sugar was low. They say that doing so would again be dangerous to C.J.'s health because an incident might occur if he goes into a hypoglycemic episode. Once again however, upon voicing these concerns to Defendant, Plaintiffs were told that they had to follow the parent's orders—even if, in Plaintiffs' view, this

was contrary to the best interests and health needs of the child.  Nye's resignation letter and Bauder-Smith's email notifying Defendant that she would no longer render care to C.J. further support Plaintiffs' argument that they were advocating in the interests of the children against Defendant staff, who were determined to side with the children's parents at all costs.

Overall, the picture that Plaintiffs paint is one in which they were not able to do their jobs as requested by the School Board without causing harm to the two disabled students.  Therefore, they advocated against the School Board's policies with regard to the § 504 plans and in support of the children's interests.  In this way, this case is analogous to *Reinhardt* and other cases in which courts have found that a plaintiff engaged in protected activity by challenging the school's deficient administration of a free appropriate public education.  *See Reinhardt*, 595 F.3d at 1132; *see also, e.g.*, *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 75–76, 78 (4th Cir. 2016) (stating in dictum that the plaintiff engaged in protected activity by criticizing the school's insufficient efforts to prevent harassment of a disabled student and raising concerns at a parents' forum about the school's lack of harassment reporting options); *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 823, 828 (9th Cir. 2009) (holding that a plaintiff has standing to bring a retaliation claim under the ADA and Section 504 where she filed a class discrimination complaint against the county education office for denying certain disabled students a free appropriate public education); *see also Montanye v. Wissahickon Sch. Dist.*, 218 F. App'x 126, 130–31 (3d Cir. 2007) (holding that a plaintiff-teacher did not engage in protected activity by scheduling therapy sessions for a disabled student and noting that "protected activity does not include mere assistance of special education students, but, rather, requires affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others").  This picture demonstrates a genuine factual dispute about whether Plaintiffs engaged in protected activity which is sufficient to establish their prima facie cases.  *See Nguyen*, 229 F.3d at 563 ("The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.").

### b. Causation

Because Bauder-Smith has sufficiently demonstrated that she engaged in protected activity and that the School Board knew of the protected activity, we turn to the other elements

of her prima facie case: whether the School Board took an adverse action against her; and whether there was a causal connection between the adverse action and Bauder-Smith's protected activity. *Shelby Cty.*, 711 F.3d at 697. Bauder-Smith has shown that Defendant took an adverse action against her by failing to rehire her when she applied for a full-time nursing position in November 2017. *See, e.g.*, *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 379, 381 (6th Cir. 2002) (stating that the defendant's failure to rehire the plaintiff is an adverse employment action); *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (stating that the defendant's decision not to reinstate the plaintiff is an adverse employment action). The parties only meaningfully dispute the last element. The School Board argues, and the district court found, that Bauder-Smith failed to show causation because there was an eleven-month gap between Bauder-Smith's advocacy (which took place from May to December 2016) and the School Board's failure to rehire her (which occurred in November 2017). However, the School Board's argument overlooks a key component of Bauder-Smith's retaliation claim: that fall 2017 was the first meaningful opportunity the School Board had to retaliate against her. This allegation creates a genuine factual dispute as to causation and thus defeats the School Board's motion for summary judgment.

"To show causation, 'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' in the absence of the protected conduct." *Weigel*, 302 F.3d at 381 (quoting *Nguyen*, 229 F.3d at 563). In some circumstances, an inference of causation may arise solely from the closeness in time between the point at which an employer learns of an employee's protected activity and the point at which it takes an adverse action against that employee. *Id.* We have accordingly denied summary judgment where a defendant took adverse action against a plaintiff just a few months after learning of his or her protected activity. *See, e.g.*, *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (holding that a lapse of two months was sufficient to show a causal connection based on temporal proximity); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that a lapse of three months was sufficient to show a causal connection based on temporal proximity).

The flipside of these cases is that the absence of temporal proximity can be "fatal" to a plaintiff's prima facie case. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675–76 (6th Cir. 2013). Thus, in *Fuhr*, we held that a "multi-year gap" of two years between the plaintiff's protected activity and the employer's adverse action defeated an inference of causation. *Id.* Relying on the Supreme Court's holding in *Clark County School District v. Breeden*, 532 U.S. 268, 273–74 (2001), and our holding in *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007), we held that "multiyear gaps between the protected conduct and the first retaliatory act [are] insufficient to establish the requisite causal connection." *Fuhr*, 710 F.3d at 676.

However, there are two situations in which even a long lapse of time is not fatal to a plaintiff's causation showing. First, a court may still draw an inference of causation where the defendant took advantage of its first meaningful opportunity to retaliate against the plaintiff, even if that opportunity did not arise until several months after the plaintiff's protected conduct. *George*, 966 F.3d at 460–61; *Dixon*, 481 F.3d at 335. Second, "even if enough time passes between the protected activity and the adverse action so as to preclude a finding of causation based on the close timing alone, an employee can still prevail if she 'couple[s] temporal proximity with other evidence of retaliatory conduct to establish causality.'" *George*, 966 F.3d at 460 (alteration in original) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)); *see also Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001) (holding that "there are circumstances where temporal proximity considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection"). Bauder-Smith's causation showing succeeds under either of these paths.

Bauder-Smith was hired pursuant to a three-year physical education grant that expired in July 2017. Following the expiration of her employment contract pursuant to that grant, the School Board did not reinstate her for the 2017–2018 school year. In August 2017, just one month after the expiration of her contract, the Board offered Bauder-Smith a substitute nursing position that would entail "only a few hours" of work. (Compl., R. 1-2, Pg. ID 12.) Bauder-Smith turned it down because she was hoping for full-time employment. In November 2017, the Board announced that it was seeking applicants for a full-time nurse. Bauder-Smith applied but was not hired. This was the first opportunity that the School Board had to refuse to rehire

Bauder-Smith after the termination of her contract, which supports an inference of causality based on temporal proximity. *See, e.g.*, *George*, 966 F.3d at 460 (holding that an inference of causality based on temporal proximity is raised "when the alleged retaliation occurs at the first chance the employer had to take the adverse action in question").

The fact that the School Board did not fire Bauder-Smith prior to the termination of the three-year grant does not defeat Bauder-Smith's prima facie case. A reasonable juror could conclude that Defendant would not want to terminate Bauder-Smith prior to the expiration of this grant, which provided a financial benefit to Defendant. Because "there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." *Dixon*, 481 F.3d at 335 (quoting *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005)); *see also id.* ("This is especially true in the context of a *reinstatement* case, in which the time lapse between the protected activity and the denial of reinstatement is likely to be lengthier than in a typical employment-discrimination case."). Indeed, it would be reasonable for a juror to conclude that the School Board took the first adverse action that it had the opportunity to take against Bauder-Smith after the expiration of her contract in July 2017.

But even if this temporal proximity alone were not enough to demonstrate causation under our precedent, Bauder-Smith has sufficiently raised an inference of causation by offering other circumstantial evidence of retaliatory conduct. *See Mickey*, 516 F.3d at 525 ("[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.").

Bauder-Smith has offered evidence suggesting that her supervisor, Ed McKinney, told her that she might lose her job as a result of her advocacy for C.J. Her email to McKinney permits an inference that McKinney told Bauder-Smith that "she needed to remember where her check came from." (Appellants Br. at 22; *see* Bauder-Smith Email, R. 34-6, Pg. ID 426.) Nye's resignation letter further suggests that Bauder-Smith and Kirilenko-Ison were being threatened by Defendant's staff at the time of their advocacy for D.M. and C.J.

This circumstantial evidence of retaliatory motive, coupled with the temporal proximity between Bauder-Smith's contract ending in July 2017 and the School Board's failure to rehire her for the 2017–2018 school year, is sufficient at the prima facie stage to create a genuine dispute as to causation. *See, e.g.*, *Mickey*, 516 F.3d at 525; *Little*, 265 F.3d at 364; *see also Dixon*, 481 F.3d at 333 ("The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.").

### c. Pretext

The School Board moved for summary judgment on Bauder-Smith's retaliation claim only on the ground that she had failed to demonstrate her prima facie case. On appeal as well, the School Board does not seriously argue that Bauder-Smith failed to meet her burden at the other stages of the *McDonnell Douglas* inquiry. We therefore decline to reach these questions in the first instance and reverse the district court on the ground that Bauder-Smith demonstrated a prima facie case of retaliation. *See George*, 966 F.3d at 468 n.6 (explaining that the forfeiture rule is "especially important in the summary judgment context" because the nonmoving party must be given the chance to develop the record in order to demonstrate a genuine factual dispute (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008))).

### 2. Kirilenko-Ison

Much of the analysis regarding Kirilenko-Ison's retaliation claim mirrors the above analysis with regard to Bauder-Smith. However, we analyze Kirilenko-Ison's claim separately because the district court's resolution of her claim rested on a different ground. The district court determined that Kirilenko-Ison demonstrated her prima facie case, but the court granted summary judgment to the School Board on the ground that Kirilenko-Ison failed to demonstrate a genuine factual dispute as to pretext. *Kirilenko-Ison*, 2019 WL 3068448, at *7. While we agree that Kirilenko-Ison demonstrated her prima facie case, we disagree that she failed to show a genuine factual dispute regarding pretext. We therefore reverse the district court on Kirilenko-Ison's claim as well.

### a. Prima Facie Case

For the same reasons discussed above with regard to Bauder-Smith, Kirilenko-Ison has alleged that she engaged in protected activity under the ADA and Section 504 by advocating on behalf of D.M. and C.J., *see, e.g.*, *Reinhardt*, 595 F.3d at 1132, and that the School Board knew of her protected advocacy.  The School Board does not deny that it subjected Kirilenko-Ison to a five-day suspension without pay because of her advocacy on behalf of C.J.  This was an adverse employment action within a few months of Kirilenko-Ison's advocating for the child and a complaint being filed as a result.  *See White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 800–03 (6th Cir. 2004) (holding that a suspension without pay is an adverse employment action even when the employee's pay is later reinstated).  Kirilenko-Ison has therefore established her prima facie case.

### b. Legitimate, Nondiscriminatory Reason

The School Board asserts a "legitimate, non-discriminatory basis" for Kirilenko-Ison's suspension.  *Shelby Cty.*, 711 F.3d at 697. It says that it suspended Kirilenko-Ison because her conduct placed C.J.'s rights to a free appropriate public education in jeopardy "and certainly undermined the spirit of FAPE" by treating C.J. differently from other students with regard to his meals, activities, and transportation.  (Suspension Letter, R. 30-14, Pg. ID 255.)  Kirilenko-Ison's conduct also, supposedly, violated the New Code of Ethics for Nurses and an Advisory Opinion Statement from KBN on the role of nurses in implementing patient care orders.

### c. Pretext

Because the School Board has satisfied its burden of articulating a non-discriminatory reason for Kirilenko-Ison's suspension, the burden of production shifts back to Kirilenko-Ison to show that the Board's proffered justification is pretextual for unlawful retaliation.  *See Shelby Cty.*, 711 F.3d at 697.  Of course, this shift in the burden of production under *McDonnell Douglas* does not increase Kirilenko-Ison's burden under Rule 56.  All that a plaintiff must show in order to overcome a defendant's motion for summary judgment at this stage is that a reasonable juror could find that the defendant's reasons were pretextual.  The plaintiff does not need to prove pretext; she only needs to show that the question of pretext is a genuine factual

dispute.  *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (cautioning that "in the context of summary judgment . . . the [*McDonnell Douglas*] burden-shifting analysis can obfuscate the appropriate question—whether there exists a genuine issue of material fact"); *George*, 966 F.3d at 462 (explaining that a plaintiff's burden to show pretext "is not heavy . . . as summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual").

Kirilenko-Ison points to numerous pieces of evidence that would allow a juror to find that the School Board suspended her in retaliation for her advocacy on behalf of D.M. and C.J.  *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.").  In fact, she alleges that Defendant staff directly threatened her and Plaintiff Bauder-Smith in response to their advocacy.  For example, after the second § 504 meeting with C.J.'s parent, Robin Kelly (the principal of the school) allegedly screamed at Plaintiffs and told them to do what the parent wants, despite protests from Kirilenko-Ison that this could jeopardize the child's health and Plaintiffs' nursing licenses.  Also, according to Bauder-Smith's email to Ed McKinney, McKinney threatened that Bauder-Smith could lose her job if she continued advocating for C.J., thereby lending credence to Kirilenko-Ison's allegation that nurses at her school were retaliated against for speaking out.  Nye's resignation letter also raises an inference that Plaintiffs and Nye were threatened by Defendant staff with adverse action as a result of their advocacy.  In accordance with these threats, Kirilenko-Ison argues that Superintendent Look "was motivated by his own personal vendetta against Kirilenko-Ison because she dared to question his authority."  (Appellants Br. at 19); *see also M.L. v. Williamson Cty. Bd. of Educ.*, 772 F. App'x 287, 292 (6th Cir. 2019) ("The same evidence can support both a finding of causation for the plaintiff's prima facie case of retaliation and a finding of pretext.").

In addition to the above, Kirilenko-Ison argues that her long work history with the School Board and the fact that she had never had any disciplinary issues with the Board prior to her advocacy for D.M. and C.J. demonstrates that the Board's explanation for her suspension "was not the actual reason" or was "insufficient to explain the employer's action."  *White v. Baxter*

*Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). She also points to the timing of her suspension as evidence of pretext, arguing that she began the 2016–2017 school year on good terms with the Board, and she was investigated for misconduct and subsequently suspended only after advocating for the rights of disabled students. *See, e.g.*, *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) ("[S]uspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." (quoting *Bell v. Prefix, Inc.*, 321 F. App'x. 423, 431 (6th Cir. 2009))).

In response, the School Board emphasizes what, in its view, establishes the legitimacy of its suspension. The Board reasserts all of its proffered justifications: the detailed complaint from C.J.'s mother; McKinney's findings that Kirilenko-Ison's actions endangered C.J.'s access to a FAPE; and Look's conclusion that Kirilenko-Ison did not behave professionally when disagreeing with C.J.'s mother. But the School Board's argument here misses an important point: we are prohibited from weighing this evidence against Plaintiff's on a motion for summary judgment. *Biegas*, 573 F.3d at 374. By simply reasserting the supposed legitimacy of its proffered justification, the School Board does nothing to undermine Kirilenko-Ison's concrete evidence of retaliatory motive. Certainly, a jury could find that the School Board's reasons were legitimate and that they were its true reasons for suspending Kirilenko-Ison. But based on Kirilenko-Ison's evidence discussed above—particularly her allegations of threats and open hostility from the Board with regard to her advocacy on behalf of D.M. and C.J.—a jury could instead "reasonably doubt" the School Board's explanation for suspending Kirilenko-Ison, and find that it suspended her, at least in part, for her protected advocacy. *Chen*, 580 F.3d at 400 n.4. Therefore, the School Board is not entitled to judgment as a matter of law.

**C. Plaintiffs' Retaliation Claims under the Kentucky Whistleblower Act**

Plaintiffs next assert retaliation claims under the Kentucky Whistleblower Act, Ky. Rev. Stat. § 61.102, based on their reporting D.M.'s mother to the Cabinet for Families and Children. "[Section] 61.102 prohibits employers from subjecting public employees to reprisal for reporting information *relating to the employers [sic] violation of the law*, alleged fraud, or abuse, etc." *Petrilli v. Silberman*, Nos. 2009-CA-001925-MR, 2009–CA–002050–MR, 2011 WL 846520, at *10 (Ky. Ct. App. Mar. 11, 2011) (emphasis in original) (quoting *Cabinet for Families*

*& Children v. Cummings*, 163 S.W.3d 425, 428 (Ky. 2005)).  In *Petrilli*, the Kentucky Court of Appeals interpreted § 61.102 as prohibiting retaliation against an employee for reporting her employer's violation of law, but not the violations of an outside third party.  *Id.* at *10–11.

Relying on *Petrilli*, the district court correctly granted summary judgment in favor of the School Board on Plaintiffs' whistleblower claims because Plaintiffs only allege that they reported D.M.'s mother of possible neglect.  Critically, they do not allege that they reported any violation of law by the School Board (i.e., their employer) to a state agency.  Therefore, their whistleblower claims fail under current Kentucky law.  *See id.* at *11 ("Without a violation of the law, there can be no whistleblower claim.").

### D.  Kirilenko-Ison's Failure to Accommodate Claim

In the final claim on appeal, Kirilenko-Ison argues that she submitted a reasonable accommodations request to the School Board but it failed to accommodate her disabilities, in violation of the ADA and the KCRA.  The ADA prohibits an employer from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112(b)(5)(A).  As noted above, we interpret the KCRA in accordance with the ADA. *Banks*, 610 F. App'x at 531–32; *Howard Baer*, 127 S.W.3d at 592.

In order to establish a prima facie case for failure to accommodate, a plaintiff must show that (1) she was disabled within the meaning of the ADA, (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation.  *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018).  Moreover, "[u]nder the ADA, an employer must engage in an 'informal, interactive process' with the employee to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Id.* at 840 (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)); *see also* 29 C.F.R. § 1630.2(o)(3) (describing the interactive process).  "Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both

parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. Generally "an employer is not responsible for a breakdown in the interactive process unless the employer actually failed to offer a reasonable accommodation." *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 788 (6th Cir. 2002).

Kirilenko-Ison concedes that she did not provide the School Board with any documentation about her disability diagnosis during the interactive process. She also admits that the School Board neither approved nor denied her accommodations request following her meeting with Superintendent Look. Instead, Kirilenko-Ison applied for disability benefits and voluntarily resigned from her position on August 17, 2017. These facts defeat Kirilenko-Ison's accommodations claim and entitle the School Board to summary judgment.

We have consistently held that an employer is "not obligated to provide accommodation until [the] plaintiff had provided a proper diagnosis of [her disability] and requested specific accommodation." *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998); *see also, e.g.*, *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000) ("An 'employer need not take the employee's word for it that the employee has an illness that may require special accommodation. Instead, the employer has the ability to confirm or disprove the employee's statement.'" (quoting *E.E.O.C. v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094–95 (6th Cir. 1998))). Further, we have held that when a plaintiff voluntarily withdraws from the interactive process based on a defendant's request for verification, the plaintiff fails to show that the defendant denied her requests for accommodations. *See, e.g.*, *Brumley*, 909 F.3d at 840–41. And although Kirilenko-Ison argues that she did not provide her medical information because the School Board asked her to sign a "blanket release," (Pl.'s Resp. Def.'s Mot. Summ. J., R. 34, Pg. ID 405; *see also* Kirilenko-Ison Dep., R. 30-2, Pg. ID 171), the district court correctly held that the School Board "did not require such a broad release of information" based on the plain language of Kirilenko-Ison's contract. *Kirilenko-Ison*, 2019 WL 3068448, at \*4. Kirilenko-Ison's contract provided that she would submit medical forms relating to her accommodations request and ability to perform her job, information to which an employer is entitled during the interactive process. *See id.* (citing Employment Contract, R. 34-5; Medical Information Request, R. 30-16).

For these reasons, Kirilenko-Ison has not demonstrated a genuine factual dispute as to the School Board's failure to participate in the interactive process in good faith.  She also has not shown that she was constructively discharged because of the Board's failure to accommodate her disabilities.  Instead, the School Board has proven (by demonstrating the absence of a genuine factual dispute) that Kirilenko-Ison failed to provide verification of her diagnosis and that she voluntarily withdrew from the interactive process and resigned from her position.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's grant of summary judgment in favor of the School Board on Plaintiffs' retaliation claims under the ADA, Section 504, and the KCRA.  We **AFFIRM** the district court's grant of summary judgment in favor of the School Board on Plaintiffs' whistleblower claims and Kirilenko-Ison's claim for failure to accommodate her disabilities.  We **REMAND** the case for further proceedings consistent with this opinion.