RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ROBERT SLOAT,

        *Plaintiff-Appellant*,

     *v.*

HEWLETT-PACKARD ENTERPRISE COMPANY,

        *Defendant-Appellee*.

No. 20-6169

───────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:18-cv-00371—Curtis L. Collier, District Judge.

Argued: July 22, 2021

Decided and Filed: November 17, 2021

Before: BOGGS, CLAY, and KETHLEDGE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** D. Alexander Burkhalter, III, THE BURKHALTER LAW FIRM, P.C., Knoxville, Tennessee, for Appellant. Dustin M. Dow, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** D. Alexander Burkhalter, III, David. A. Burkhalter, II, Zachary J. Burkhalter, THE BURKHALTER LAW FIRM, P.C., Knoxville, Tennessee, for Appellant. Dustin M. Dow, Martin T. Wymer, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellee.

───────────────

## OPINION

───────────────

KETHLEDGE, Circuit Judge. Robert Sloat sued his former employer, Hewlett-Packard Enterprise Company, asserting claims under the Age Discrimination in Employment Act ("ADEA") and the Tennessee Human Rights Act. The district court granted summary judgment

to Hewlett-Packard, holding that Sloat lacked evidence supporting a prima facie case for his claims. We respectfully disagree and reverse.

I.

In describing the facts for purposes of summary judgment, we view the evidentiary record in the light most favorable to Sloat. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).

Hewlett-Packard hired Sloat in 2011 to develop training programs for its salespeople. Sloat was 54 years old at the time. For the next five years his performance reviews were notably positive: his managers found that his work "exceeded expectations" in 2011, 2012, and 2015, and "significantly exceeded expectations" in 2013 and 2014. In each of those years, Sloat also received a 30% performance bonus. In late 2015, Sloat developed a highly regarded training program for sales managers worldwide, called "Ropes to the Ground" ("Ropes"). Sloat spent most of 2016 implementing Ropes in "the Americas" and in "Asia-Pacific Japan." In June 2016 Hewlett-Packard promoted Sloat to the executive-level position of director, in which he reported to Marcel Keller. For that fiscal year (which ended in October), Keller found that Sloat's performance met expectations.

Sloat's fortunes began to change in October 2016, when he learned that his position would be transferred to a different group within Hewlett-Packard. Keller told Sloat, "This is a good thing for you. They want Ropes to the Ground." Sloat was then age 60, which made him the oldest person reporting to his new manager, Steven Hagler. During their first phone call, Hagler said that he didn't know what Sloat's responsibilities would be or what would happen to Ropes. Shortly before the transfer took effect on November 1, Sloat attended a meeting in Dallas along with Hagler's other direct reports. That meeting was the first time that Hagler and Sloat met in person. Hagler gave a PowerPoint presentation in which he showed Sloat as having no responsibilities. That made Sloat nervous, so when Hagler said he needed "someone to step up" to replace the director of his "analytics team," Sloat volunteered for the role. At the end of the meeting, Hagler asked Sloat and Sandy Connor—who was the training director for Hagler's group—to stay an extra day to discuss Ropes. Connor agreed to have Sloat and three of her

subordinates compare Ropes with her existing training program.  After that evaluation, the group agreed that Ropes was the superior program, but Connor changed its name to "License to Lead." Hagler put Connor in charge of the renamed program, though Sloat played a supporting role.

Hagler was cold and distant toward Sloat from the start.  One month after Sloat joined Hagler's group, Hagler told him that he would not receive a raise the coming year and that Sloat's annual performance bonus would be only 8%.  Hagler explained that he rewarded his "top performers" and "everyone else got what was left."  Sloat responded that he had been "an outstanding performer for the year before"; Hagler said, "Not for me."

A month later, in January 2017, Hagler met with his direct reports in Houston.  At one point during the meeting, Hagler's chief of staff, Christie Hayden, referred to Sloat as "Ron"; when Sloat objected (his name is Robert), Hayden said, "How about if we call you Uncle Ron." Everyone but Sloat laughed; and rather than intervene, Hagler joined the others in referring to Sloat as "Uncle Ron" during the meeting.  Hagler also addressed Sloat (in Sloat's view sarcastically) as "young man" several times during the meeting.  When Sloat's turn came to do a presentation, he initially "fumbl[ed]" with the laptop computer; Hagler stepped forward and said, "You've got old skills.  You need vice president support on this"—and put the laptop into presentation mode himself.

Meanwhile, on at least ten occasions after the Houston meeting, Hagler asked Sloat, "When are you going to retire?"  A month or so after the meeting, Sloat complained to Seema Iyer, Hewlett-Packard's Vice President of Human Resources, that Hagler was discriminating against him based on his age and was asking him when he would retire.  Iyer told Sloat to speak to Hagler about his concerns, which Sloat promptly did.  That conversation went badly; Hagler was furious, "screaming" that "he hadn't done anything."  Soon afterward, Hagler reassigned Sloat's remaining responsibilities for Ropes to Connor, and spoke to Sloat by phone (Sloat worked remotely) only seven times in four months.  Around that time—in March 2017—Hagler asked Sloat, "Why are you still here?"  That same month, Hagler emailed Iyer and asked that she reassign Sloat to a different position within Hewlett-Packard so that Sloat would no longer report to him.  That effort failed after Iyer told the in-house recruiter assigned to the issue that Sloat might present a "chemistry" problem for the first position the recruiter suggested.

In June 2017, Hagler recommended to Hewlett-Packard's human-resources team that the company fire Sloat in a one-person work-force reduction, on the ground that Sloat's job was redundant with Connor's. In response, Iyer emailed Barbara Randell (an HR subordinate), flagging that "[t]here is a WFR [*i.e.*, workforce reduction] situation in Steven Hagler's team that needs some legal attention" and asking Randell to talk with Hagler about "the rationale and any risks associated with" firing Sloat. Hagler decided not to fire Sloat at that time—but only after Randell told him to wait until the company proceeded with a "significant downsizing" that was pending then.

The next month, in Sloat's mid-year performance review, Hagler gave Sloat a performance rating of "Stalled"—the second-worst rating a Hewlett-Packard employee can receive. When Hagler met with Sloat about it, Sloat told him that the poor rating was motivated by age discrimination and that he thought Hagler was retaliating against him for Sloat's complaint about age discrimination a few months before. Hagler told Sloat to talk to Randell about it, which Sloat promptly did; Randell then told Sloat to talk to Hagler about it and otherwise did nothing to investigate the allegation. In an email to Randell later that same month, Hagler said that Sloat's responsibilities (as reduced by Hagler himself) did "not equate to a Director level position" but that his concern "may resolve itself with the new structure [*i.e.*, the downsizing] …" (ellipses in original). About three weeks later—on August 16—Hagler's boss, Kelly Ducourty, warned him to "be careful what to put in mail ref Rob." Hagler responded, "I understand."

As part of that downsizing, Hewlett-Packard decided to break up Hagler's team. Some of his employees would be reassigned to Vice President Terry Flynn, while others would be fired. On August 31, Iyer prepared two spreadsheets containing data on hundreds of employees. One spreadsheet said that the impact of terminating Sloat was "low"; the other had Sloat alone designated as "plan for exit." Iyer herself had merely "collected" that information, as opposed to making those judgments about Sloat. Iyer emailed at least the "plan for exit" spreadsheet to Flynn's HR representative two weeks later, saying that it reflected discussions between Hagler and another manager.

Around the same time, Hagler sent Flynn a PowerPoint presentation in which he indicated that Sloat's future was "not clear[.]" About two weeks after that, Hagler and Flynn had a lengthy phone call in which (among other things, presumably) Hagler described Sloat's job responsibilities and said he "didn't have a great relationship" with Sloat. A day or two after that call, Flynn put Sloat "on the slate" for termination. A few weeks later—in the first conversation that Flynn ever had with Sloat—Flynn told Sloat that he would be fired. Afterward, Flynn wrote in his notes that he "was surprised that Steven Hagler was not . . . instructed to do the notification since [Sloat] currently reports to him."

Sloat thereafter sued Hewlett-Packard, asserting claims of age discrimination and retaliation under both the ADEA and the Tennessee Act. Hewlett-Packard moved for summary judgment, which the district court granted based substantially on the post-hoc explanations of Hewlett-Packard's own witnesses. This appeal followed.

## II.

We review the district court's grant of summary judgment de novo. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 719 (6th Cir. 2008). We analyze claims of discrimination and retaliation identically under the ADEA and the Tennessee Act. *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006) (discrimination); *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (retaliation).

### A.

Sloat argues the evidence in his case would allow a jury to infer that he was terminated "because of" age discrimination. *See* 29 U.S.C. § 623(a)(1). To meet that standard, Sloat must show that age "had a determinative influence on the outcome of the employer's decision-making process." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (cleaned up). A plaintiff can make that showing either by means of a "direct case"—in which the evidence would allow a jury to find that the employer essentially admitted discriminating unlawfully—or, more commonly, by means of an "indirect case," in which the evidence would allow a jury to infer unlawful discrimination. *See id.* Sloat contends that he presented sufficient evidence to support an indirect case, which we must analyze under the three-step framework laid out in

*McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Pelcha*, 988 F.3d at 324. Under that framework, the plaintiff must first establish a prima facie case of discrimination; if the plaintiff does that, the employer must identify a legitimate, nondiscriminatory reason for the adverse employment action; and if the employer does that, the plaintiff must prove that the employer's reason is a mere pretext for discrimination.  *Id.* at 325.

1.

As to Sloat's prima facie case, the parties dispute only whether Sloat met a requirement applicable in cases where the plaintiff was terminated as part of a workforce reduction:  namely, that the plaintiff present "evidence tending to indicate" that the employer singled him out "for discharge for impermissible reasons."  *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (internal quotation marks omitted).  But we set that issue aside for now, since (on this record at least) it largely duplicates the pretext inquiry.

As to the second step of the *McDonnell Douglas* framework, Hewlett-Packard has undisputedly offered a legitimate, non-discriminatory reason for firing Sloat:  namely, that his remaining responsibilities could be handled by others.

That leaves the question whether Hewlett-Packard's proffered reason for firing Sloat was a pretext for age discrimination.  Pretext is simply an inquiry about causation; and causation in discrimination cases usually turns on whether an undisputed decisionmaker acted with a discriminatory motive.  Sometimes, however, the identity of the relevant decisionmaker himself is disputed.  Such is the case here:  Hewlett-Packard emphasizes that Flynn, rather than Hagler, fired Sloat.  But "[a]n employer is also vicariously liable for retaliation that a supervisor initiates against an employee by causing another actor, that might itself lack retaliatory animus, to take an adverse action against the employee."  *Mys v. Mich. Dept. of State Police*, 886 F.3d 591, 600 (6th Cir. 2018).  Substitute "discrimination" for "retaliation" and the rule remains the same.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421–22 (2011).  This theory of vicarious liability allows a plaintiff to hold his employer liable for the animus of an intermediate actor "who was not charged with making the ultimate employment decision."  *Id.* at 415.  (This theory is often called

the "cat's paw"—but cat's paw is a useless metaphor, which obscures rather than illustrates the theory's particulars.)

Sloat invokes this theory of vicarious liability here. Our causation inquiry is therefore twofold. First, we must determine whether a jury could find that Hagler rather than Flynn was the relevant decisionmaker as to Sloat's termination. And second, if a jury could indeed find that Hagler was the relevant decisionmaker, we must determine whether a jury could also find that Hagler's discriminatory actions were a but-for cause of Sloat's termination. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

a.

As for the first question, an employer is liable for the discriminatory animus of an intermediate actor who intends to cause, and in fact proximately causes, "an adverse employment decision." *Staub*, 562 U.S. at 421. Sloat argues that he has evidence to support all three findings as to Hagler: animus, intent, and proximate cause.

(i)

As for animus, at age 60, Sloat was Hagler's oldest direct report. Hagler never suggested or offered him any job responsibilities (Sloat volunteered for two of his patchwork assignments), other than giving him a supporting role in Ropes's integration into Sandy Connor's group. In addition, only one month after Sloat joined Hagler's group—and after six years of positive (often extremely positive) performance reviews and an unbroken string of annual 30% performance bonuses—Hagler gave Sloat a comparatively meager 8% performance bonus and no raise at all. Hagler was also dismissive of Sloat's efforts (the "Not for me" remark). This evidence would allow a jury to infer that, for some reason, Hagler had prejudged Sloat's capabilities.

A month later, in the Houston meeting, Hagler joined others present in referring to Sloat—over his express objection—as "Uncle Ron," and said in front of the group that Sloat had "old skills." From that episode a jury could infer that Hagler viewed Sloat as old. That point was reinforced by one of the most powerful pieces of evidence in Sloat's case: that, on at least ten occasions, Hagler asked Sloat, "When are you going to retire?" (Hagler admitted in his

depositions that he had these conversations with Sloat.) Retirement is obviously a concept closely associated with being older; the term "retirement age" is not used to describe persons in the bloom of youth. That Hagler repeatedly badgered Sloat about retirement—in an undisputedly stressful and hard-driving work environment—would allow a jury to infer that the *reason* Hagler had prejudged Sloat's capabilities was that Hagler thought he was too old for the job.

Hewlett-Packard offers two responses as to the retirement badgering in particular. One is that Hagler's inquiries were "not frequent[.]" Br. at 34. That response is inexplicable: one or two inquiries along these lines from one's boss might be dismissed as isolated; even more inquiries could form a pattern; but ten inquiries, a jury could easily find, is a campaign. Hewlett-Packard also responds that Hagler asked about Sloat's retirement plans "in the context of Hagler telling Sloat that he did not appreciate his constant emails." Br. at 33. But that point merely views the evidence in a light favorable to Hewlett-Packard; that Hagler complained about Sloat's emails in these conversations does nothing to preclude the straightforward inference that Hagler thought Sloat should retire because Hagler thought he was too old for the job. In sum, Sloat has sufficient evidence that Hagler was biased against him because of his age.

(ii)

Hagler's inquiries about retirement also support an inference that Hagler engaged in a series of actions, driven by bias, whose intended effect was to drive Sloat out of the company. At first (one could reasonably infer) Hagler pushed to have Sloat leave voluntarily; to retire from a position is to leave it. That Hagler gave Sloat "the lowest bonus of all his direct reports"—and told Sloat as much directly—supports this view. So does the fact that, in March 2017, Hagler asked Sloat, "Why are you still here?" (Hagler did not dispute that point either in his deposition.) But Sloat did not leave voluntarily, so (one could reasonably infer) Hagler sought to terminate him. Hagler's first attempt took the form of a proposed one-person workforce reduction—to adopt the characterization of Seema Iyer, Hewlett-Packard's vice-president of human resources—in which Sloat's position alone would be eliminated. Hagler abandoned that plan only after Iyer flagged it for "legal attention" and Randell advised him to wait for a company-wide workforce reduction that was then pending.

The latter fact supports an inference not only that Hagler wanted Sloat terminated but also that he wanted Sloat terminated in the upcoming company-wide workforce reduction in particular. Other evidence supports that inference as well. The spreadsheet that designated Sloat as "plan for exit" was prepared, as noted above, after discussions with Hagler. A jury could find the same to be true about the spreadsheet that said the impact of Sloat's termination would be "low": the person who prepared the spreadsheet, Seema Iyer, merely "collected" that information; and Hagler was Sloat's manager at the time. A jury could reasonably infer that Hagler provided information for that spreadsheet just as he did for the other one (both of which Iyer circulated on the same day). Hagler himself also sent Flynn a PowerPoint presentation in which he indicated (by color-coding) that Sandy Connor should remain with the company and that Sloat's future was "not clear." And Hagler had a lengthy phone call with Flynn during which Hagler commented negatively on his relationship with Sloat—and after which Flynn promptly designated Sloat for termination. Sloat therefore has presented evidence from which a jury could reasonably find that Hagler acted with the intention of having Sloat terminated.

(iii)

That leaves the question of proximate cause. That term has different meanings in different contexts, but in this context the Supreme Court has defined proximate cause to require "only some direct relation" between the conduct of the intermediate actor and the adverse employment decision. *Staub*, 562 U.S. at 419 (cleaned up). By contrast, if the plaintiff was fired for "reasons unrelated" to the conduct of the intermediate actor, the employer is not liable for that conduct. *Id.* at 421.

The question, then, is whether Sloat has evidence of "some direct relation" between Hagler's conduct and Flynn's decision to fire Sloat. At the time of that decision, Flynn had little first-hand experience with Sloat (only a conference call or two) or knowledge of his capabilities. Flynn notably did send Sloat an email on March 30, 2017, stating that Ropes was "awesome" and that "I have spent 17 years in sales prior to this SS&P role and the Ropes to the ground material I have seen is spot on." But Flynn was unaware until his deposition in this case that Sloat had developed that program and had devoted virtually all his efforts to implementing it before his transfer to Hagler's group. That was largely because Hagler had removed Sloat from

that role (around the same time that Hagler called him "Uncle Ron" and was repeatedly asking him when he would retire). And by the time that Flynn needed to make a decision about whether to retain Sloat, Hagler had stripped Sloat of any role in Ropes (or the renamed License to Lead) at all.

Thus, at that time, as a result of Hagler's actions, Flynn had available to him the following information about Sloat: that he had a patchwork of responsibilities—Flynn himself called them "special projects"—which Hagler himself insisted were not commensurate with a director-level position; that Sloat's current manager (Hagler) had given Sloat a dismal evaluation ("Stalled") in his most recent performance review; that the impact of Sloat's termination would be "low" and that Sloat had been designated as "plan for exit" with regard to the company's workforce reduction; that Hagler personally had indicated to Flynn that Sloat's future with the company was "not clear," in contrast to another employee who Hagler indicated should stay with the company; and that Hagler had commented negatively to Flynn about his relationship with Sloat. Hagler's actions (one could reasonably infer) thus left Sloat with a profile that practically dictated Flynn's decision to terminate him. That Flynn designated Sloat for termination almost immediately after talking with Hagler about him is also evidence of Hagler's influence upon the decision to fire Sloat. So is Flynn's notation at the time that he was surprised that Hagler did not himself inform Sloat of his termination. Hewlett-Packard responds that Sloat lacks evidence that Flynn reviewed either of the spreadsheets that Iyer circulated. But Iyer undisputedly circulated at least one spreadsheet to the HR representative for Flynn's group. And the spreadsheets' purpose was not academic; they were plainly prepared for purposes of the workforce reduction. If Flynn was indeed the decisionmaker for Sloat's termination, one could reasonably infer that he would have seen them. Thus, in summary, a jury could find that Hagler, rather than Flynn, was the relevant decisionmaker as to Sloat's termination.

b.

Nearly the same analysis supports the conclusion that a jury could find that age discrimination was a but-for cause of Sloat's termination. To prove but-for causation, the plaintiff must "show that age '*had a determinative influence on the outcome*' of the employer's decision-making process." *Pelcha*, 988 F.3d at 324 (quoting *Gross*, 557 U.S. at 176).

The preceding analysis already explains why a jury could find that age discrimination by Hagler was an actual cause of Sloat's termination. That analysis likewise explains why a jury could find that Flynn's proffered reason for terminating Sloat was itself the result of Hagler's antecedent discriminatory conduct. Thus, a jury could find that age discrimination had a determinative influence on the decision to fire Sloat. He is therefore entitled to a jury trial on those claims.

B.

Sloat also argues that he has sufficient evidence that Hewlett-Packard fired him in retaliation for complaints about age discrimination. We apply the three-step *McDonnell Douglas* framework to these claims as well. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). The only difference is that—in determining whether Sloat has evidence supporting a prima facie case—we ask whether a jury could find that Hewlett-Packard fired Sloat because of his complaints about age discrimination, rather than because of age discrimination itself. *Id.*

As to that question, Sloat emphasizes that Hagler "scream[ed]" at him and was "furious" when (per Iyer's advice) he told Hagler directly that he thought Hagler was discriminating against him because of his age. Sloat also has evidence that, after that conversation, Hagler avoided speaking with him (by Hagler's count, they spoke seven times in the next four months), stripped him of all his remaining responsibilities as to Ropes, and gave him his worst performance review ever. Hagler also tried to get Sloat transferred off his team and—when that failed—sought to terminate him in a one-person "WFR." Moreover, Iyer's email flagging that "situation" for "legal attention" and an examination of "the rationale and any risks associated with it" supports an inference that even she thought the one-person "WFR" was potentially retaliatory. Thus, much of the same evidence that supports Sloat's claim of age discrimination likewise provides sufficient support for his prima facie case for the retaliation claim.

The same is true as to the second and third steps of the *McDonnell Douglas* framework. Hewlett-Packard's explanation for firing Sloat remains the same; and many of the facts that support Sloat's prima facie case for the discrimination claim likewise would allow a jury to find that Hagler had a retaliatory motive in setting Sloat up for termination and that

Hewlett-Packard's explanation for his termination was pretextual. Whether Hagler's actions were motivated by retaliation is for a jury to decide. *See Imwalle*, 515 F.3d at 544–45.

\* \* \*

The district court's judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.