NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0216n.06

Case No. 22-1776

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

JOSHUA ZARZA, substituted party on behalf of Karen Zarza, deceased,

    Plaintiff-Appellant,

v.

BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN,

    Defendant-Appellee.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**FILED**<br>May 05, 2023<br>DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

</td></tr>
</table>

Before: COOK, GRIFFIN, and NALBANDIAN, Circuit Judges.

COOK, Circuit Judge. The University of Michigan fired Karen Zarza. The University says it responded to complaints from Zarza's subordinates. Zarza says it retaliated against her after she advocated for a disabled employee. Because a jury could reasonably believe either account, we REVERSE the district court's grant of summary judgment for the University.

I.

Karen Zarza worked for the University of Michigan from 2003 to 2017. She maintained a clean record with her superiors. For much of her tenure, she held a custodial supervisor role, managing between 15 and 20 janitors and custodians.

Robert Taylor was one such custodian. From 2013 to 2015, Taylor suffered a series of work-related injuries that he says left him disabled. Claiming that he provided inadequate documents to support his accommodation requests, the University fired Taylor in 2015.

Taylor filed two lawsuits against the University in 2017. He told Zarza that he would need her as a witness. Concerned about testifying against her employer, Zarza scheduled a meeting for May 11, 2017, with John Lawter, one of her supervisors. She also invited two other custodial supervisors.

At the meeting, Zarza staked out a clear position. As she saw things, the University unlawfully refused to accommodate Taylor. Much of the blame, she thought, belonged to Colette Donner, a manager, who held "a grudge against [Taylor]." R.44-5 at 2–3. Despite her views that Donner "was vindictive" and would fire her if she spoke up, Zarza revealed that Taylor had called her as a witness and that she planned to testify on his behalf. R.44-11 at 6.

After hearing this, Lawter's "face turned beet red." R.44-12 at 3. As Zarza recalls it, he warned her about colluding with Taylor, adding that the University would tell her what to say so long as she remained an employee. Lawter's response struck Zarza and her fellow supervisors as defensive, angry, or threatening. Lawter, for his part, recalls telling Zarza that she could testify if she chose to do so.

Five days later, Zarza's comments to Lawter prompted an email exchange between Sabrina Garrett-Owens, a human resources director, and Kristin Brancheau, a manager with the custodial department. Brancheau described Zarza's intent to testify that the University failed to accommodate Taylor's disability and Zarza's concern that Donner was "out to get her." R.48-15 at 2. "When the evidence shows that [Zarza] is not accurate," Brancheau asked, "can we finally

discipline her for this?" *Id.* Garrett-Owens responded that Lawter "c[ould] do more than fire her" if the evidence showed that Zarza was wrong. *Id.*

That's what Lawter concluded. He called Zarza on May 25 to say that her concerns about Donner lacked evidence. Zarza heard the same message on June 28, when she met with Brancheau and Leti Rastigue, a human resources director. Zarza again asserted that Donner did not adequately handle Taylor's case and Zarza repeated her concern about testifying for Taylor. Brancheau and Rastigue disregarded that concern, reasoning that Zarza's testimony would be irrelevant or inadmissible.

The status quo held for two months. One of Zarza's fellow custodial supervisors called Donner on September 5. The supervisor told Donner that Zarza berated him, that she bullied her subordinates and yelled at them, and that she gave her favorites special privileges.

Donner acted quickly. Within hours, she forwarded the supervisor's comments to Lawter and Brancheau. Lawter met with the supervisor the next day. Alongside complaints against Zarza, the supervisor mentioned Robert Taylor. Lawter observed that "Taylor's name seems to just swirl around wherever [Zarza] is." R.48-12 at 22.

The pace did not slow. On September 11—before investigating further or hearing Zarza's side of the story—Lawter placed Zarza on administrative leave. The following day, Brancheau conducted interviews. She talked to fourteen custodians and to Donner. In a twelve-page report, she concluded that Zarza was "mean, unprofessional, [and] unpleasant"; that she treated temporary employees poorly; and that she gave special privileges to some employees. R.48-19 at 2–4, 13. Among these criticisms, Brancheau noted in her report that Zarza "told [a custodian] about Robert Taylor suing the [University]," and that she "hope[s] he wins as he was done wrong." *Id.* at 6.

Rastigue received the report on September 13, and she interviewed Zarza about the allegations the same day. Zarza denied any wrongdoing. Even so, Rastigue told Zarza that she remained on administrative leave. Shortly after, Rastigue interviewed Donner about the complaints against Zarza.

Zarza did not take all this quietly. She began with a retaliation complaint through the University system, asserting "that her administrative suspension [was] the result of her expressing complaints to John Lawter." R.48-39 at 2. She also emailed the University's legal counsel. She again linked the allegations against her to the Taylor case and to the meeting with Lawter. The counsel forwarded the email to Garrett-Owens, interpreting the email to allege that Lawter "threatened [Zarza] regarding potential testimony in the Robert Taylor lawsuit." R.48-37 at 2. Garrett-Owens looped in Rastigue and Brancheau.

Despite Zarza's attempts to raise the alarm, no one investigated her retaliation claims against Donner and Lawter. Instead, Donner and Lawter continued to provide input on the investigation *against* Zarza.

Garrett-Owens, Rastigue, and Lawter exchanged "[s]trategy" emails a few days after Zarza's email to the University's counsel. R.48-42 at 2. Garrett-Owens began, saying that she had been thinking about "the best approach to ending [Zarza's] employment." *Id.* She explained that Zarza "no longer demonstrates the qualities we need" in a supervisor and that multiple issues "severely diminished her credibility." *Id.* Garrett-Owens proposed "immediately releas[ing Zarza] from her duties" and giving her 21 days to accept a settlement. *Id.* If Zarza refused, Garrett-Owens proposed convening a Disciplinary Review Conference to "seek[] her discharge." *Id.* "Given her years of service and lack of documented discipline," Garrett-Owens added, settlement

appeared their "best option." *Id.* Lawter thought the plan was "worth a shot," though he speculated that Zarza would "claim[] retaliation." *Id.* at 3. Rastigue also signed on.

Rastigue wasted no time. She met with Zarza and presented the settlement offer on September 21, two days after the strategy emails. When Zarza asked about her options "to refute the charges," Rastigue replied that Zarza "should use this time to search for a job." *Id.*

Zarza refused the settlement offer. As promised, the University scheduled a Discipline Review Conference for November 10. The morning of the conference, a University employee emailed Brancheau to say that Taylor had subpoenaed Zarza. "If she's not [employed] at the time of trial," the employee observed, "we can't be required to 'produce' her so that could actually be another benefit to terminating employment." R.48-43 at 2.

The Disciplinary Review Conference began a few minutes later, with Garrett-Owens, Rastigue, and Donner presiding. Garrett-Owens explained that the University charged Zarza with "unsatisfactory work performance, specifically creating a hostile work environment of fear, intimidation, and harassment." R.48-44 at 2. Zarza denied the charge, asserting that she was a good supervisor and a loyal employee.

The University fired Zarza five days later. Donner, Garrett-Owens, and Rastigue served as the primary decisionmakers, though Lawter and Brancheau contributed.

Zarza sued the University, asserting several retaliatory termination claims. After discovery, one claim remained: Zarza alleged that the University fired her in retaliation for her opposition to its treatment of Robert Taylor, violating the Rehabilitation Act. 29 U.S.C. § 701 *et seq.* The district court granted summary judgment to the University. Zarza appeals.

## II.

"We review the district court's grant of summary judgment de novo." *Allman v. Walmart, Inc.*, 967 F.3d 566, 570 (6th Cir. 2020). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We view the evidence "in the light most favorable" to the nonmoving party, Zarza. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

## III.

Zarza argues that the district court improperly granted summary judgment to the University on her retaliation claim under the Rehabilitation Act. We analyze that claim under the *McDonnell Douglas* framework. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must present a prima facie case of retaliation; "if the plaintiff does that, the employer must identify a legitimate, nondiscriminatory reason for the adverse employment action; and if the employer does that, the plaintiff must prove that the employer's reason" served as a pretext for retaliation. *Sloat v. Hewlett-Packard Enter.*, 18 F.4th 204, 209 (6th Cir. 2021).

## A.

*Prima facie case.* To state a prima facie case of retaliation, Zarza must show that (1) she engaged in protected activity under the Rehabilitation Act; (2) the University knew of her protected acts; (3) she suffered an adverse action; and (4) her protected acts caused the adverse action. *Gribcheck*, 245 F.3d at 550.

The district court concluded that Zarza stated a prima facie case. On appeal, no one disputes that Zarza satisfies the first three elements. She engaged in protected activity under the Rehabilitation Act by "opposing" the University's allegedly unlawful treatment of a disabled employee, Robert Taylor. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 696–97 (6th Cir. 2013); *see Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 661 (6th Cir. 2020). After learning of her stance, the University suspended Zarza and then fired her. *See Burlington N. & Santa Fe Ry.*, 548 U.S. 53, 71–73 (2006) (suspension qualified as an adverse action); *Kirilenko-Ison*, 974 F.3d at 667 (same).

The University challenges only causation. Zarza must present enough evidence to permit the inference that her superiors fired her due to her protected activity. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009). She needs only "minimal" evidence to create that inference. *Shelby Cnty.*, 711 F.3d at 701. To establish causality, plaintiffs often point to temporal proximity and some "other evidence of retaliatory conduct." *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 588 (6th Cir. 2022) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Zarza follows that well-trod path. She begins with temporal proximity. She spoke out against Taylor's treatment in May and in June. Lawter suspended Zarza in September. Around a week later, Zarza's superiors planned a second adverse action—termination. And before the calendar flipped to October, Rastigue presented Zarza with an unattractive choice: quit or face a Disciplinary Review Conference. Leaving little doubt about what the conference would decide, Rastigue told Zarza to start looking for a job. The University fired Zarza on November 15. Whether tallied from Zarza's suspension or her termination, the interval between protected activity and adverse action is probative (but not determinative) of a "retaliatory motive." *Bledsoe*, 42 F.4th

7

at 588 (three-month interval is probative); *see Upshaw*, 576 F.3d at 588–89 (four-month interval); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (six-month interval).

Zarza bolsters the timing with other evidence. She points to Lawter's visible anger at her stance on the Taylor case. She points to the emails between Garrett-Owens and Brancheau expressing their desire to fire Zarza for her opposition to Taylor's treatment. She points to the "[s]trategy" emails where Garrett-Owens acknowledged Zarza's spotless record and yet plotted to fire her. R.48-42 at 2. She points to the University's failure to investigate her concerns or to remove Donner and Lawter from the decision process. Combined with the timeline, this evidence would allow a jury to conclude that Zarza's comments about Donner's refusal to accommodate Taylor rankled her superiors and led to her termination.

The University disagrees, arguing that the complaints against Zarza acted as an intervening cause that separate Zarza's comments from her termination. As the University confesses, it failed to press this point below. *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1098 (6th Cir. 2023). The argument also falters on its own terms. Given Garrett-Owens' and Brancheau's desire to terminate Zarza for her protected activity, a jury could believe that the complaints did not come out of the blue, but as a welcome "opportunity to terminate" Zarza. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009); *see Upshaw*, 576 F.3d at 590 ("Given [these] statements, a jury could reasonably conclude that the [reasons] used to justify terminating Upshaw were contrived to mask what was, in fact, retaliation for her complaint activity.").

The University adds that the timeline alone generally cannot establish causation. We agree. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448–49 (6th Cir. 2020). But the timing works in tandem with Zarza's "other indicia [of retaliation] to support a causal connection." *Id.* at 449.

Zarza clears the prima facie case's "low hurdle." *Gribcheck*, 245 F.3d at 551.

B.

*Legitimate, non-discriminatory reason.* At the second step of *McDonnell Douglas*, the University must provide a legitimate, non-discriminatory reason for firing Zarza. The University offers one: It relied on the custodians' complaints and Brancheau's report to fire Zarza for "[u]nsatisfactory work performance, specifically creating a hostile work environment of fear, intimidation, and harassment." R.44-22 at 2. We agree with the district court that this reason satisfies the University's burden. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350 (6th Cir. 2021).

C.

*Pretext.* The burden shifts to Zarza. Though her "burden is not heavy," she must show that the University's proffered reason for firing her served as pretext for retaliation. *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020). She may do so in various ways, including through evidence that the University's asserted reason lacked a factual basis or did not actually motivate the University. *Jackson*, 999 F.3d at 350–51. Ultimately, we ask a "commonsense" question: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow. Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

The district court concluded that Zarza identified insufficient signs of pretext. We see things differently. A jury could find that the University's proffered reason—Zarza's alleged mistreatment of her colleagues—served as a pretext for retaliation.

Consider the factual basis of the complaints against Zarza. Some employees found Zarza unpleasant, abrasive, or unfair. But Zarza denies these accounts. She points to evidence that she did not yell at her coworkers or mistreat them. And she points to evidence that she treated her

9

coworkers fairly and respectfully. With some evidence in her corner, Zarza creates a dispute as to whether the University's asserted reasons "lack a basis in fact." *Shelby Cnty.*, 711 F.3d at 702.

Other realities undermine the University's claimed rationale. Look at Zarza's record. She worked for the University for 14 years without "documented discipline," as Garrett-Owens noted. R.48-42 at 2. Zarza received a positive review from Donner in 2012, the only evaluation in the record. And just a year before Zarza's termination, Donner offered to recommend Zarza for a promotion. Despite all this, Zarza's superiors—including Garrett-Owens and Donner—fired her just a month after complaints surfaced. A jury could find their haste suspicious, especially when compared to their relaxed response to Zarza's complaints of retaliation. *See Kirilenko-Ison*, 974 F.3d at 668.

Couple Zarza's abrupt suspension and termination with the proximity of her opposition to the University's treatment of Taylor. Recall the timing. Four months separated Zarza's initial complaint to Lawter from his decision to suspend her. In September, Zarza's superiors strategized about "the best approach to" firing her and told her to "search for a job." R.48-42 at 2, 4. In two months more, the University fired Zarza. During that time, Zarza repeated her support for Taylor, as well as her belief that her superiors were retaliating against her. And on the morning of the Disciplinary Review Conference, Brancheau heard that Taylor issued a subpoena for Zarza's testimony and that "another benefit [of] terminating" Zarza would be that the University would not "be required to 'produce' her." R.48-43 at 2. Altogether, a reasonable jury could find that the University's stated reasons "were not its true reasons." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

The responses that Zarza received to her views on Taylor also suggest that retaliation motivated Zarza's superiors. Think of Lawter's face turning "beet red" when Zarza claimed that

Donner illegally refused to accommodate Taylor's disability. R.44-12 at 3; *see Sloat*, 18 F.4th at 213 (visible anger supported pretext). Think of her claim that Lawter "threatened" her not to testify for Taylor. *Kirilenko-Ison*, 974 F.3d at 668 (threat supported pretext). And think of Brancheau and Garrett-Owens agreeing that they could "more than fire" Zarza for her stance on Taylor's treatment. R.48-15 at 2; *see Brooker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (explaining that protected activity includes mistaken complaints).

The University disagrees with this conclusion.

Acknowledging Zarza's position that the complaints against her lacked a basis in fact, the University counters that it honestly believed the complaints. *See Shelby Cnty.*, 711 F.3d at 705. But the University failed to develop this point below (or any point on pretext), *United States v. Montgomery*, 998 F.3d 693, 697–99 (6th Cir. 2021); *Bard v. Brown Cnty.*, 970 F.3d 738, 750–51 (6th Cir. 2020), and it matters little here anyway. Whatever the University's belief, a jury could conclude that Zarza's protected activity motivated the University, not the complaints from her subordinates. *Kirilenko-Ison*, 974 F.3d at 668.

As with causation, the University posits that the custodians' complaints and Brancheau's report had nothing to do with Zarza's support for Taylor. A jury could find otherwise. Mingled with other complaints about Zarza, one custodian told Lawter about Zarza's views on Taylor. And in one of Brancheau's interviews, a custodian said that Zarza "told him about Robert Taylor suing the U," and of her "hope [that] he wins as he was done wrong." R.44-8 at 7. Brancheau's report included that comment, as well as Zarza's remark that "the University didn't treat [Taylor] well and she hopes he wins his lawsuit against us." *Id.* at 8. That Brancheau included these statements in her report—the same report the Disciplinary Review Conference relied on—allows a jury to infer that opposition to Zarza's protected acts played a role. *Shelby Cnty.*, 711 F.3d at 704–05

11

(emphasizing emails that "consistently reflected a concern with the [protected activity]"); *Jackson*, 999 F.3d at 352; *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515–18 (6th Cir. 2021). And a reasonable juror could find that Brancheau was biased from the outset given her May 16 email to Garrett-Owens asking if the University could "finally discipline" Zarza for continuing to assert that the University failed to accommodate Taylor. R.48-15 at 2.

The University also points to statements from Zarza's superiors where they deny retaliating against Zarza. A jury could find these assertions trustworthy and disregard Zarza's contrary evidence, but we may not. *Briggs*, 11 F.4th at 507. A jury must decide whether the University acted with legitimate or retaliatory motives.

## IV.

Zarza independently claims that the district court erred in addressing the pretext prong at all, arguing that the University did not move for summary judgment on that ground. *See* Fed. R. Civ. P. 56(f); *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013). Because we identify a material dispute of fact on pretext, we do not consider this alternative argument.

## V.

We REVERSE and REMAND for further proceedings consistent with this opinion.