NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0538n.06

No. 23-3167

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 27, 2023
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| PATRA NOUMOFF, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| CHECKERS DRIVE-IN RESTAURANTS, INC., | ) | OHIO |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

Before: KETHLEDGE, THAPAR, and MATHIS, Circuit Judges.

KETHLEDGE, Circuit Judge. Patra Noumoff sued her former employer, Checkers Drive-In Restaurants, Inc., asserting claims under Title VII of the Civil Rights Act of 1964 and the Ohio Fair Employment Practices Law. The district court granted summary judgment to Checkers. We affirm.

I.

In describing the facts for purposes of summary judgment, we view the record in the light most favorable to Noumoff. *See Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 209 (6th Cir. 2021).

Patra Noumoff was the general manager of a Rally's Restaurant (owned by Checkers) in Spring Grove, Ohio, from May 2013 to November 2015, and then again from June 2016 to October 2018. Her responsibilities included managing employees, controlling food and labor costs, and ensuring that staff complied with Checkers' time-keeping policies. Checkers evaluated Noumoff's

performance several times a year, in part by reference to a "scorecard" that measured the Spring Grove restaurant's financial success relative to budget. Most of Noumoff's performance evaluations were positive, though she received a formal warning in November 2017 for "substandard work."

In January 2018, Checkers hired Almir Velagic to be the district manager of the Cincinnati region. That made him Noumoff's direct supervisor. Velagic reported directly to April Williams, Employee Relations Manager, and Gordon Rowan, Operations Director. Williams and Rowan, in turn, reported to Carlos Del Pozo, Senior Director of Operations, and David Bode, Senior Director of People Support.

Velagic and Noumoff had a combative relationship from the start. Weeks after Velagic became district manager, he told Noumoff that he was concerned about the quality of service at the Spring Grove restaurant, having "mystery shopped" there three times. He also told her that the Spring Grove restaurant was the only one in his region that had exceeded budgeted labor hours during a recent reporting period. Noumoff dismissed these concerns, telling Velagic that his "mystery shopping" feedback was unwelcome and that his labor hour calculations were wrong.

It was downhill after that. According to Noumoff, Velagic began regularly to berate her in front of other staff members, several times telling her "I am done with you." The resulting tension was exacerbated in early February, when Noumoff challenged Velagic's authority regarding a hiring decision.

Velagic eventually told Williams and Rowan that he was frustrated with Noumoff's behavior, and forwarded them several emails and texts that he thought illustrated the problem. Williams suggested that Velagic respond with a formal warning for discourteous behavior, but Velagic instead decided to have an informal conversation with Noumoff about the value of

teamwork, which he thought would keep their "relationship intact and moving forward." Velagic later reported that Noumoff seemed "receptive" to his comments.

In early April 2018, however, Noumoff sent Rowan (the Operations Director) a long email in which she said, among other things, that Velagic was treating her unfairly because she was a woman. Specifically, Noumoff said that Velagic routinely cut her off in conversation and often ignored her requests for additional staffing and supplies—conduct that she said showed Velagic did not "like [her] as a female." Noumoff also told Rowan that she was "disappointed" and "disgusted" that Velagic had not fired a Spring Grove employee, Antone, after Noumoff and another employee, Tessa, had accused him of sexual misconduct and harassment. (Velagic instead reprimanded Antone and eventually transferred him to another Checkers' location.)

The next day, Rowan forwarded Noumoff's email to Williams (the Employee Relations Manager), who promptly opened a formal investigation into Noumoff's complaints about gender discrimination. As part of that investigation, Williams called Noumoff and asked her for specific examples of how Velagic treated her differently because of her gender. Noumoff said that Velagic "never let her finish her sentences[,]" and also mentioned Velagic's handling of the "issue" with Antone. After Williams spoke with Noumoff, she told Rowan that she would "investigate to determine the validity of the claim" even though Noumoff "didn't provide anything necessarily specific about being treated differently[.]"

On April 16, while Williams's investigation was still pending, Noumoff called Velagic to discuss a staffing issue at the Spring Grove restaurant. According to Noumoff, Velagic immediately began "screaming" at her, so she hung up on him. (Velagic said that they talked, that Noumoff disagreed with what he said, and that Noumoff abruptly hung up.) Later that day, Noumoff sent an email to Rowan and Williams in which she said, among other things: "I WILL

NOT BE TREATED THIS WAY, AND SCREAMED AT. I wamt [sic] to file a formal complaint and if Rallys will not concede, I will file a complaint with another office. I am done with this. Rallys IS NOT doing its due didgence [sic] to support me." But Williams apparently believed Velagic's version of events, and issued Noumoff a formal written warning a few days later for "hanging up on" Velagic and for "sending the email 'yelling'" at her and Rowan.

Around the same time, however, Williams also followed up with Noumoff regarding her complaints about Velagic. Williams told Noumoff that she planned to close the investigation if Noumoff could not provide concrete instances of discriminatory treatment. Noumoff never followed up, so Williams formally closed the investigation at the end of April.

In late May 2018, Noumoff emailed Marc Mediate, Checkers' Chief Operating Officer, to complain that Velagic had refused to let her take a sick day and had also suspended her when she could not find someone to cover her shift. She added that "things" had "not been good" between her and Velagic since she complained about his behavior. Mediate immediately forwarded Noumoff's email to Williams and Rowan. Williams responded shortly thereafter, telling Mediate that she had investigated Noumoff's complaints about gender discrimination and was unable to substantiate them. The next day, Noumoff went to work as she normally would, and was apparently never formally suspended or reprimanded.

In June 2018, however, Noumoff received her second written warning. Earlier that month, Noumoff emailed Rowan after Velagic had denied her request for certain vacation days. Rowan told Noumoff that she could take only one vacation day between June 8 and June 10. Noumoff took vacation on all three days anyway, so on June 12 she was issued a formal written warning for insubordination. (The written warning appears to have been mistaken about what days Noumoff

took off. But Noumoff agreed in her deposition that she knowingly took vacation days that had not been approved.)

Twice over the next few months, Noumoff called Del Pozo (the Senior Director of Operations) directly to complain about Velagic's behavior. First, in August 2018, Noumoff told Del Pozo that "Velagic was being particularly hateful and mean" to her and other female general managers in his district. Then, on October 8, 2018, Noumoff told Del Pozo again that Velagic had continued to treat her "more harshly than other managers of because of [her] gender." (The record is unclear whether Del Pozo reported these complaints to Williams or anyone else at Checkers. Del Pozo said in his deposition that he could not recall either conversation.)

Meanwhile, on October 2, 2018, Williams received a phone call from a former Spring Grove restaurant employee, Van Estill, who complained that Checkers owed him wages for time he had worked but not been paid. Williams immediately began an investigation. By way of background, Checkers has its employees record time in a computer program that registers the precise times that each employee clocks in and out. If an employee forgets to clock in or out, the restaurant's general manager is required to document any "time punch changes" both electronically (in the computer program) and physically (in a "time punch change binder" that each restaurant keeps on site). If the general manager modifies an employee's timecard, both the employee and the general manager must verify the accuracy of the change by initialing the physical time-record that goes in the time punch change binder.

While investigating Estill's complaint about missing wages, Williams compared the electronic time-punch records with the specific dates and times that Estill said he had worked but not been paid. Williams noticed that Estill's electronic timecard showed a 28-minute break during a period that Estill had said he was working. Soon after discovering this discrepancy,

Williams emailed Noumoff, requesting a picture of the physical time-record from the time-punch change binder. (Presumably, Estill would have physically initialed this record if the time-punch change was accurate.)

Noumoff responded the next day, October 12. At first, Noumoff said the time punch records were "not in [the] binder any longer"; but a half hour later, she texted Williams a picture of those records—which showed that, though an adjustment had been made to Estill's clock out time, neither he nor Noumoff had initialed next to that change in the time punch change binder. Noumoff also texted Williams a picture of the electronic time record report, which timestamps show was printed shortly before Noumoff sent it to Williams. On that printed copy of the time report were Noumoff's handwritten notes, which indicated that she had reviewed video footage from Estill's shift and confirmed that Estill had taken a break but failed to clock back in.

A few hours later, Noumoff contacted Williams again, this time to inform her that, just that afternoon, another former Spring Grove restaurant employee, Qiana Bargainer, had also complained that Checkers owed her wages. Noumoff then emailed Williams and Velagic a copy of a handwritten note that, according to Noumoff, Bargainer had signed to document the time for which she was owed wages—3.75 hours from a shift on September 13. Noumoff also forwarded this document to the payroll department.

Williams then continued her investigation, now suspecting that Noumoff had intentionally altered the time records. She first reviewed the electronic time report from the day that Bargainer had said she was missing wages. That report showed that, on September 13, Bargainer clocked in at 8:31 P.M., but clocked out a minute later, at 8:32 P.M. Williams then reviewed another time report which showed that on September 17, Noumoff had changed Bargainer's clock out time from 12:08 A.M. on September 14 to 8:32 P.M on September 13—thereby "taking away" 3.75 hours

that Bargainer had actually worked. (Noumoff later said in her deposition that she had simply made a mistake.) Williams then requested and reviewed video footage from the Spring Grove restaurant. That video footage showed two things: first, that Estill was working during the time he had purportedly clocked out for a 28-minute break; and second, that Noumoff was the one who had adjusted both Estill and Bargainer's time in the electronic timekeeping system.

On October 16, 2018, Williams completed her investigation and concluded that Noumoff had manipulated employee time records in violation of Checkers' policy. On that basis, Williams recommended to Del Pozo that Noumoff be fired immediately, and Del Pozo and Bode authorized the termination. Velagic suggested that they wait to fire Noumoff until her replacement had completed training; but Williams and Bode both objected. Williams explained to Velagic that, "after finding a violation of company policy and of federal wage and hour laws, allowing [Noumoff] to remain employed exposes the company to serious liabilities and is not recommended." Bode agreed, reiterating the "seriousness" of employee time manipulation. Noumoff was terminated the following week.

Noumoff thereafter sued Checkers, asserting claims of gender discrimination and retaliation under both the Title VII and the Ohio Fair Employment Practices Law (the "Ohio Act"). The district court granted summary judgment to Checkers, holding that Noumoff lacked evidence from which a jury could find that Checkers' proffered reasons for disciplining and then firing Noumoff were pretextual. This appeal followed.

II.

We review the district court's grant of summary judgment de novo. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). We analyze claims of discrimination and retaliation identically

under Title VII and the Ohio Act. *See Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003) (discrimination); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003) (retaliation).

A.

Noumoff's primary argument on appeal is that the evidence in her case would allow a jury to infer that Checkers retaliated against her for complaining about gender discrimination. *See* 42 U.S.C. § 2000e–3(a). Checkers responds that it had "legitimate, nondiscriminatory reasons" for its actions—namely, that Noumoff violated Checkers' employee conduct policy. Thus, Noumoff must present evidence from which a jury could find that Checkers' explanations are a pretext for unlawful discrimination. *See Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014).

To demonstrate pretext, a plaintiff must ultimately prove both that her employer's stated reason for ending her employment "was not the real reason for its action, *and* that the employer's real reason" was discrimination. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc). At summary judgment, however, a plaintiff need only produce evidence that would allow a jury to find that her employer's stated reason "is unworthy of credence." *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 147 (2000) (quotation omitted); *see Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). To that end, a plaintiff can typically create a genuine issue of fact by producing evidence that the employer's stated reason (1) had no basis in fact; (2) did not actually motivate the employer's actions; or (3) was insufficient to motivate the employer's actions. *See Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021).

1.

Noumoff first argues that the proffered reason for her termination had "no basis in fact." *Briggs*, 11 F.4th at 515. Specifically, Noumoff contends that she mistakenly altered the time records—and therefore did not do so "improperly" or "intentionally."

But if an employer produces evidence that it honestly believed "in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). To demonstrate an honest belief, the employer must provide evidence that it "made a reasonably informed and considered decision" based on reasonable reliance on particularized facts. *Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 960-61 (6th Cir. 2014) (quotation omitted).

Here, Checkers has offered ample evidence that Williams, who recommended that Noumoff be fired, and Del Pozo and Bode, each of whom supported Williams's recommendation, made a reasonably informed and considered decision. (It is unclear whether Del Pozo or Bode was "the final decision-maker," but both authorized Noumoff's termination.) Williams made her recommendation to fire Noumoff after conducting a detailed investigation—during which she reviewed electronic time records from the days the employees said they were missing wages, cross referenced those records against "punch card" modifications made outside Checkers' electronic time-keeping system, and reviewed video footage from the restaurant. Williams then determined, in light of that evidence, that Noumoff had manipulated the employees' time in violation of Checkers' policy. Williams therefore reasonably relied on particularized facts—which themselves showed that Noumoff had manipulated employee time records—when she recommended that Checkers fire Noumoff.

Del Pozo and Bode, in turn, relied primarily on Williams's recommendation—which highlighted the specifics of Noumoff's time-keeping manipulation—when they authorized Noumoff's termination. Thus, Del Pozo and Bode each made reasonably informed and considered decisions to end Noumoff's employment for violating Checkers' policy.

Noumoff offers two responses. First, she says that Williams made an uninformed decision because she did not speak to Noumoff or "ask either of the two employees if there was any basis to believe Noumoff was doing anything intentional to steal or deprive them of wages." Maybe Williams should have done those things; but so long as an employer honestly and reasonably believed the nondiscriminatory reason for its action, the employer need not use an "optimal" decision-making process that leaves "no stone unturned." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (internal quotation marks omitted). Here, as shown above, Williams recommended that Checkers fire Noumoff only after she scrutinized the time records and reviewed video footage from the restaurant—all of which, in Williams's professional judgment, showed that Noumoff had manipulated employee time records in violation of Checkers' policy. Checkers has therefore shown that it honestly believed its non-discriminatory reason for firing Noumoff, which means that Noumoff has failed to establish pretext on the grounds that Checkers' "proffered reason[] had no basis in fact." *Briggs*, 11 F.4th at 515.

Second, Noumoff contends that Checkers waived its "honest belief" defense by raising it for the first time in its reply brief below. Generally, an argument raised for the first time in a reply brief is "not properly raised before the district court, and so [is] also not properly preserved for appeal." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010). But Noumoff opened the door in her response brief below by challenging the thoroughness of Williams's investigation. And in any event, an argument is not deemed waived "where the

district court fully addressed the argument in its order and where both parties fully briefed the issue on appeal." *Salling v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442, 444 (6th Cir. 2012) (cleaned up). Here, the district court considered Checkers' honest belief argument in its opinion and held that, because of it, Noumoff could not establish pretext as a matter of law. In addition, both parties have briefed and argued the issue on appeal. Thus, Checkers did not waive this argument. *See Lexicon, Inc. v. Safeco Ins. Co. of Am.*, 436 F.3d 662, 670 n.6 (6th Cir. 2006).

2.

Noumoff next argues that a jury could find that Checkers disciplined and then fired her in retaliation for her complaints about gender discrimination. Specifically, Noumoff says that because each disciplinary incident occurred shortly after she had complained about perceived gender discrimination, a jury could find that Checkers' actions were retaliatory. But Noumoff lacks any evidence aside from temporal proximity that Checkers' actions were in fact motivated by retaliatory intent. And "we have repeatedly cautioned against inferring causation based on temporal proximity alone." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471–72 (6th Cir. 2012). Instead, in each instance, an intervening event interrupted the causal chain, thereby dispelling any inference of retaliation.

First, Checkers' intervening discovery of Noumoff's time manipulation undermines any inference that Checkers true motivation for firing her was retaliation. Indeed, so far as the record shows, Checkers fired Noumoff after discovering her actions—and over Velagic's objections about the disruption that would cause—precisely because it regarded the manipulation of employee time records as particularly serious. *Cf. Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (the presence "of an obviously nonretaliatory basis" undermines an inference of "retaliatory motive"). Checkers made its decision to fire Noumoff only after a notably

thorough investigation by Williams; and Noumoff lacks any evidence that Checkers did so for any reason other than improper time manipulation. *See Reeves*, 530 U.S. at 148 (an employer is entitled to judgment as a matter of law "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision"). Noumoff responds that Checkers was "simply searching for mistakes" to "justify a termination." But nothing in the record supports that assertion. Williams undisputedly opened her time-manipulation investigation only after she was informed that two former Spring Grove employees were missing wages for time they had worked.

The same is true for both written warnings. Between the time Noumoff complained and the time of her first written warning (for discourteous behavior), she hung up on Velagic and then sent an email "yelling" at Williams and Rowan. And Checkers' policy prohibits "disrespectful" behavior to "fellow employees." Similarly, Noumoff received her second written warning (for insubordination) only after she knowingly took unapproved vacation days. This action, too, was in violation of Checkers' policy—namely because Noumoff directly disobeyed Rowan's orders. Thus, in each instance, Checkers had an intervening legitimate reason to discipline Noumoff, which dispels an inference of retaliation based on temporal proximity. *Wasek,* 682 F.3d at 472.

Noumoff lacks evidence that would allow a reasonable jury to find that her misconduct did not "actually motivate" Checkers' decisions. Simply put, Noumoff has not shown that her alleged evidence of retaliation makes it more likely than not that Checkers' decisions were pretextual. *See Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 675-76 (6th Cir. 2008). Her argument that her warnings and termination were retaliatory therefore fails.

3.

Noumoff also contends that Checkers' reasons for disciplining and then firing her were insufficient to explain its actions. But Noumoff has not identified any other similarly situated

Checkers employee who engaged in comparable behavior but was treated less severely. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286-87 (6th Cir. 2012). Moreover, Checkers' Employee Handbook plainly provides that each of Noumoff's actions could result in "discipline[], up to and including termination." Hence this argument fails too.

B.

Noumoff next argues that the district court should not have applied the *McDonnell–Douglas* analysis to her retaliation claim because she offered direct evidence of retaliation. Specifically, Noumoff says that the April 2018 written warning is direct evidence of discrimination because Checkers issued that warning in direct response to her complaints about Velagic's putative gender discrimination. Direct evidence, however, "is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 349 (6th Cir. 2021) (quotation omitted). Here, Checkers' issued the April 2018 warning not because Noumoff complained, but because she hung up on Velagic and then "yelled" at Williams and Rowan. One would therefore have to draw an additional inference to conclude that this warning was in fact retaliatory. Thus, Noumoff has failed to offer direct evidence that Checkers fired her in retaliation for her protected activity. The district court correctly awarded summary judgment to Checkers under the *McDonnell Douglas* framework.

C.

Finally, Noumoff argues that the district court erred in granting summary judgment to Checkers on her discrimination claim. But Noumoff has not met her burden of establishing that Checkers' proffered nondiscriminatory justification was a pretext for discrimination for the reasons stated above.

\* \* \*

The district court's judgment is affirmed.